SUNBEAM, The (ULRICH v.). See Case No. 14,329.

SUNBERG (UNITED STATES v.). See Case No. 16,417.

---

## Case No. 13,616.
### SUNDAY v. GORDON et al.
[1 Blatchf. & H. 569.] [1]

District Court, S. D. New York. Feb. 8. 1837.

SHIPPING — MASTER'S TORTS—SEAMEN—CUSTOM-PARTIES.

1. The owners of a vessel are not liable for personal torts committed by a master without their knowledge or approval.
[Cited in Taylor v. Brigham, Case No. 13,781. Disapproved in Gabrielson v. Waydell, 67 Fed. 344.]

2. Passengers and seamen who are carried to a port different from the one agreed upon, may maintain an action in admiralty for damages.

3. Slight credit will be given to the unsupported evidence of a witness who testifies to admissions obtained by him from a party for the purpose of charging him thereby.
[Cited in The C. N. Johnson. 19 Fed. 783.]

4. Persons who are not strictly mariners may charge a vessel or her owners, in admiralty, for services on ship-board which are necessary to her navigation or safety.

5. But, where a master who contracts a sickness in a foreign port employs a native as a man servant or attendant only, those services are not a charge upon the vessel or her owners.

6. Evidence of a usage to receive such natives temporarily on board of a vessel, and to leave them at convenient ports in the course of the voyage, paying them for their services at the discretion of the master, is admissible to determine the extent of the liability of the owner of a vessel, when sued for wages by such a native employed on board the vessel.

7. A person who, from incapacity of mind or other cause, cannot be made to understand the English language, cannot be a party to a sworn libel. He should sue under the guardianship of a committee, a prochein ami, or a trustee.

This was an action to recover seaman's wages and damages [by Quaselle Sunday against Joseph Gordon, Jacob D. Fowler, and Charles Shilletoe]. The libel alleged that the libellant shipped at Elmina, on the coast of Africa. as a seaman on board the brig Packet, of which the respondents were owners, to perform a voyage to the port of Liberia, also in Africa, at twelve dollars per month; that it was agreed he should be set ashore at the latter place; but that the master of the vessel. in violation of his contract, did not set the libellant on shore at Liberia, but brought him, against his will, to New-York. For this tort the libellant claimed damages. The libel further alleged, that the libellant performed duty on board during the voyage, which lasted between two and three months; that, on arriving in New-York, he assisted in discharging the cargo and relading the vessel for a voyage out again; that the libellant was assured by the master and owners that the brig was loading for a voyage back to Elmina, and that he should be returned to the port of his

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

residence and nativity; and that, in April or May, 1835, the vessel sailed, as the libellant was assured and supposed, for Elmina, but in truth for Mogadore, in Morocco, and came thence back to New-York, without going to Elmina or within a thousand miles thereof, and without sending the libellant home or permitting him to leave the brig. The libellant averred that he would not have gone on said voyage but for the assurance and under the expectation that he was to be carried directly to his place of residence, and he charged this as a fraud upon him by the master and owners. The libel further alleged, that the brig arrived in New-York in the month of November, 1835; that the libellant did duty during the whole voyage, being between six and seven months; that he served on board, including both voyages, eleven months in all; that he signed no shipping articles; that the highest wages at the port of New-York, within the three months next preceding the last voyage, were sixteen dollars per month; and that he had received no wages except twelve dollars paid him at Elmina. The libel alleged, also, that the libellant was a native of Africa, and understood the English language but imperfectly, and that, after he was discharged, one of the respondents took him to his house in the city of New-York, and compelled him to begin a course of servitude in his family. To the libel were annexed eleven interrogatories, which the respondents were required to answer under oath.

The respondents, in their answer, denied that the libellant shipped at Elmina as a seaman, and that he did duty as a seaman on board the brig, and that he was capable of doing seaman's duty, and that the master had paid him twelve dollars within their knowledge. They admitted that the brig arrived at New-York, after a passage of three months and one day, and that the libellant remained on board during the discharge of her cargo, and until she was reladen for another voyage, and asserted that the master of the vessel died at the quarantine, one hour after the vessel arrived there. They denied that the libellant assisted in lading or unlading the vessel, and that he did any duty on board, and that, after the death of the master, the new master or the owners assured the libellant that the brig was loading for a voyage back to Elmina, or that he should return direct to that port. They did not admit that any assurances had ever been given to the libellant that he should return to Elmina from New-York as soon as the brig could make the voyage, or that the libellant was a native of Africa, or that the respondents gave the libellant any assurances that the brig was going direct to Elmina on her second voyage, or that they ever offered to send the libellant home, or refused to allow him to leave the brig, or practised any fraud upon him, and they further denied that any such assurances were given to the libellant, to the best of their knowledge. They alleged that the brig was bound to Mogadore, and returned to New-York in November, 1835, and they denied that the libellant continued on board eleven months and did duty as a seaman, and that the master, or any other person connected with the brig, had put the libellant to servitude, and that the libellant was anxious to return to Africa. On the contrary, they allege that he refused to return on two several occasions when passages had been procured for him, and that he was indebted to them in the sum of one hundred and fifty dollars for money advanced. They also denied that they owed the libellant one hundred dollars, or any other sum, and that Shilletoe, one of the respondents, was ever a part owner of the vessel, and they set forth the names of her present owners.

The evidence offered by the libellant, to prove his employment upon the brig, consisted of conversations in this city between a colored man, who offered to act as his friend, and Shilletoe, one of the respondents, in which the services and claims of the libellant were admitted. It was proved by the other respondents that Shilletoe was not a part owner of the vessel, and had no power to bind, by his declarations, the other respondents in their character of owners. The remaining evidence is sufficiently stated in the opinion of the court.

Alanson Nash and Erastus C. Benedict, for libellant.

John A. Morrill, for respondents.

BETTS, District Judge. The answer of the respondents seems to be drawn with reference to the special interrogatories annexed to the libel, rather than to the charges of the libel itself, and therefore does not furnish very direct or distinct issues to the allegations of the libel. In fact, the answer is so framed as to amount to a negative pregnant upon nearly every averment incorporated in it. The pleader who drew it has attempted to intermingle the formulæ of answers in chancery with a very abrupt and literal mode of negation to the allegations of the libel. Upon the interposing of a proper exception, the court would have ordered the entire answer to be withdrawn, and a plain, succinct, but full reply to be given to the positions of the libel. The libellant having, however, treated the answer as sufficient, and brought the cause to trial upon proofs, it becomes necessary to gather from the pleadings the points that are at issue in such a way as to admit of evidence being given in regard to them, and then to ascertain what testimony, if any, comes properly within the compass of such issues. The pleadings may probably admit the construction that the gravamen of the libellant's action is denied. At all events, no fact supposed to supply a right of action is admitted by the answer, and in the condition of the cause before the court, the libellant will ac-

cordingly be no less required to support his case by proofs, than he would have been had a plain and unequivocal denial been interposed.

The libel seems framed with the intent to exhibit four distinct causes of action—two resting in contract, and two in fraud, deceit and unlawful violence. The contracts asserted by it, are a hiring of the libellant as a mariner, at Elmina, in Africa, to proceed to Liberia, at twelve dollars per month, and a hiring in New-York at least by implication, to serve as a seaman on a voyage back to Elmina. The matters of fraud and deceit or force. are the surreptitiously bringing the libellant off from Africa, and afterward carrying him out to Mogadore, and thence back to New-York. If the libellant was tortiously brought off from Africa, that was exclusively the act of the deceased master. There is no evidence that he was authorized to obtain, by hiring, force or stratagem, negroes on the coast, for the purpose of bringing them to this country, or that the owners afterwards approved the act; and the owners, accordingly, would not be chargeable for any act of trespass, false imprisonment or kidnapping perpetrated by the master. The tortious acts charged upon the owners, and assumed by the libellant's counsel to have been proved. consist in shipping the libellant under a representation that he should go to Elmina, when in fact it was intended the vessel should go to Mogadore only, and in transporting him. against his will, to this country, and compelling his services on the voyage. I think a seaman might sustain an action in this court for a wrong of that character, and be compensated in damages adequate to the nature of the injury. In the matter of contract. the mariner is at all times entitled to an undisguised disclosure of the voyage he is to perform; and it would be an outrage meriting the vigorous interposition of the tribunals, if a foreigner, shipped under the assurance of being taken on a coasting voyage from place to place, and of then being discharged at his home port. should be compelled to perform an entirely different voyage, and one terminating at the home port of the ship, in a place not contemplated in the contract or known to the mariner. And, if the libellant was to be regarded merely as a passenger. he would be entitled to a strict performance of the contract for his transportation, and to have redress against the ship-owners in this court for a violation of it. Certainly, a ship-master cannot be justified in taking passengers, on an engagement to carry them to a specified place, and in afterwards, at his own election, changing his ship's destination, and carrying them on such voyages as he or the owners may choose to make, and finally landing them in a remote and to them unknown country. Passengers can maintain their actions and obtain redress in courts of admiralty for such violations of contracts

with them. But the testimony entirely fails. in establishing either a contract of hiring, as set up by the libel, or an agreement to carry the libellant as a passenger.

If the respondent Shilletoe was correctly understood by the witness who says he has admitted he was part owner of the ship, there is no proof showing that he had, in fact, any interest in her, and his declaration could, accordingly, avail no further than to charge him individually, if such statement, in the absence of all other evidence of ownership, would render him liable in that character. The answer denies that he was owner at any time, and such is the proof on the part of the other respondents; and, admitting that Shilletoe asserted that he was a part owner, his declarations alone would not be competent evidence to charge the other respondents. The respondent Gordon, in conversation with the same witness, declared that the owners were in no way responsible to the libellant, and that the master had acted without authority, and wholly contrary to their wishes, in bringing a native African from his own country to the United States. Very little reliance can be safely placed upon the version of conversations given by a witness who was seeking through them the means of maintaining an action in favor of his employer. However honest and commendable his motives might have been, a witness so employed would be exceedingly apt to remember statements favoring the wishes of his employer, and to forget or not listen to explanations and qualifications made at the time. That this has been so in the present case, to a very considerable degree, is obvious from the testimony of another witness on the same subject. On a careful examination of the proofs, it appears to me they establish no more than this state of facts—that it is customary, on the coast of Africa, for trading vessels to employ natives, at about twenty-five cents per day, as laborers, in loading and unloading foreign vessels in harbor and doing other work on board of them; that these laborers frequently accompany such vessels from port to port along the coast, and often come out to the United States and return with them; that, in the latter cases, they are compensated by a "clash," as it is called, being some trifling articles for trade, and also personal clothing; that the natives regard it as a great object to come off in that way and learn the English language, as it gives them consequence at home and enables them to get good employment on vessels trading on the coast; that they are no sailors. and are never put to duty as seamen; that, in this particular case. the libellant came off with the expectation of being left at Liberia, but the master, being sick with the fever common to that coast, retained him as a nurse or waiter to attend upon him. and brought him to the United States; that he understood nothing of a ship's duty, and was never, whilst attached to the brig,.

put to any other employment than that of sweeping decks and occasionally working at the pump, and then chiefly for his necessary exercise; that his services were never of any value to the vessel; that, when the brig went back from this port, with the libellant on board, she was on a trading voyage, and it was within her instructions to run down the coast of Africa, if a good market should not be earlier found, and there land the libellant where he could most readily reach home; that, after the cargo was disposed of at Mogadore, no vessel was there by which the libellant could be sent down the coast; that the master refused to leave him, because, by the laws of Morocco, he would have become a slave; that he was accordingly brought in the ship to the United States; and that the respondents clothed and maintained him here, and procured a passage for him back to Liberia on two occasions, but that once he refused to go, and on the other occasion he was out of health, and probably so much so as to excuse his accepting the offer. The court can discern, in these facts, nothing that affords the libellant ground for maintaining this action. It is very clear that he was not employed on board as a mariner; and, although a person filling another capacity may charge the ship or her owners for his services, yet, if he is employed by the master, and not for the owners, it must appear that he performed services necessary for the ship or for the business in which she was engaged. Waiters and chamber-maids on board a packet-vessel might undoubtedly compel the owner of that vessel to pay the wages agreed by the master; but, if such persons were retained for the individual comfort or necessity of the master alone, no liability could be imposed on the owner for their services. It might, in this instance, have been a prudent and necessary thing for the master to employ a native servant to wait upon him, in a sickness contracted in that climate; but, whether he be a mere servant, or a nurse or a physician, the services are for the master individually, and have not such relation to the ship or crew as to render the owners responsible for them. The evidence, certainly, is very faint, as to the occasion or manner of the libellant's being employed; and, if it is helped out at all by implication, the custom of the coast would probably furnish the key of interpretation which the court would be bound to accept; and, in that view, the libellant must be regarded as having gone on board the vessel on the well understood terms of enjoying an opportunity to acquire the English language, and of receiving such gratuity as the master might see fit to bestow. There is certainly nothing to justify the court in inferring that he did not leave Liberia, where the vessel touched, with the same readiness that he left Elmina. It is shown to be the ordinary usage to carry natives from Elmina to the Cape, to the Gulf of Benin and to Liberia, and to land them,

and then for other vessels to take them back; and, if the libellant went voluntarily to Liberia, there is nothing laid before the court to raise a presumption that he had not a free opportunity to leave the vessel at that port, or that he came with her from that place upon any other terms than were customarily allowed in similar cases. In either of these points of view, the action cannot be sustained—first, because the libellant's services were not rendered to the vessel, but to the master individually, and therefore the owners are not chargeable for them; and secondly, if they are to be regarded as services rendered to the vessel, they were to be compensated in conformity to the usage of the coast, chiefly by affording to the libellant the means of learning the English language, and then by giving him a small gratuity at the discretion of the master. The court perceives, in arrangements of this character with native Africans, much to disapprove. If they occur frequently, they will lead to abuses that may well awaken serious apprehensions here as to the ultimate interests and welfare of these benighted beings, and as to the purposes of ship-masters in bringing them off. But, looking at the case as one between party and party, I am not prepared to say, that such arrangements are to be utterly disregarded, and that the court shall take the interests of the prosecutor in charge and now see such rights measured out to him as might, by a prudent or intelligent man, have been insisted on and secured before the transaction was engaged in. In contemplation of law, this libellant was competent to enter into such contract of service, and to bind himself to its performance. He must be regarded as thus competent, as much so as any foreigner, and as no more under the guardianship and protection of this court. Whether, then, the engagement was advantageous or onerous to him, will not be inquired into here, unless for the purpose of seeing whether the evidence shows him to have been incapable of entering into a contract, or that some imposition was practised upon him.

The court does not hesitate to express its disapprobation of arrangements of this description with individuals in an uncivilized and savage condition of life, and particularly with Africans upon the slave coast, both because of the lively sensitiveness pervading the public mind in respect to that population, and because of the hazard that our laws and national character may be compromised, by unscrupulous men, in those remote regions, and in transactions with a class of beings easy to be decoyed, and who ordinarily would possess no means, if brought to this country, much less if landed in South America or the West Indies, of vindicating their rights. Yet, the ability of free negroes to surrender up their time and give their services for what to them may appear an adequate consideration, however trivial such compensation may be intrinsically, is not to

be questioned in the abstract. It must also be recollected, that the valuation of their services is not to be adjusted or measured by our standard, but by theirs. The palm oil, gold dust or ivory that might be gladly exchanged on that coast by vagrant savages for baubles or strips of calico of light value, would doubtless be adequate to pay the wages of an able seaman in our service; and, until a metallic currency shall be known there, which may afford a common measure of value, fabrics for use or mere trinkets may, in barter, command exchanges vastly out of proportion to the estimate they would receive in marts of trade having a specie medium of valuation, and there is nothing in principle inhibiting that exchange to be of services as well as of the products of the country. The inexperienced and crude estimates of value by the natives of those regions may as well be the basis of contracts for service, as of contracts for the barter of commodities; and, as to the competency of such persons to bind themselves by contracts for voyages, this court cannot discriminate between them and Malays or Chinese. If, then, the libellant were to be regarded as having engaged, in the capacity of a mariner, to perform a voyage, I should, upon the proofs, hold that no money wages were to be paid him, and that he had received all the compensation which his engagement contemplated. I am, however, clearly of opinion, that there was no hiring of him as a mariner or for the service of the vessel, but that he was employed on the part of the master solely, for his individual comfort or necessity, and that the owners are not chargeable upon his engagements. The testimony is very explicit to show, that when the libellant went out to Mogadore, it was in no respect in the character of a seaman. Captain Huggett's evidence puts it beyond doubt, that the libellant was regarded merely as a passenger, to be returned gratuitously in that way to his native country. There was no agreement of the master to send him home, except upon the chance of the vessel's going to Elmina. It was a contingency in contemplation, but the voyage was a trading one, liable, from its nature, to terminate long before reaching that place. It did terminate, in the course of its ordinary prosecution, two or three thousand miles from Elmina. The return of the libellant with the vessel to the home port was, accordingly, necessary to his preservation from a state of slavery, to which he would have been subjected if he had been left at Mogadore.

So far as the proofs disclose, the motives of the respondents, their treatment of the libellant in this country, and the measures taken by them to procure his return to Africa, were dictated by sentiments of liberal and commendable kindness. He was brought to this country without their assent or knowledge, but in a vessel owned by some of them, and through the agency of their master. Death had since put it out of his power to fulfil towards this man the purposes upon which he was brought across the ocean; and the respondents seem throughout to have acted with a marked anxiety to execute in full all that the master had contemplated. They twice procured for him a free passage home in vessels belonging to others. They disbursed for his support and clothing here from fifty to eighty dollars, and, at the last, offered to contribute an additional ten dollars towards getting him off, if his friends could obtain a passage for him in a colonization vessel. It has been thought better to resort to a suit as a means of compelling the respondents to do more. But I am constrained to say, that no action could well be brought more bald of legal or equitable support.

The occasion seems further to require, that I should observe, that suits of this character ought never to be instituted in the name of the party, without the direct authorization of the court. This ignorant savage, who cannot communicate at all in our language, is made to attest, under oath, to a series of allegations and statements, which, so far as his consciousness is concerned, he is scarcely more capable of making than any other individual of his tribe remaining in Africa. According to the testimony of some of the witnesses who know him best, he can hardly be made to comprehend the simplest facts occurring before his senses. How, then, is he advisedly to frame a deposition which, under the sanction of an oath, shall enlighten the court as to his rights? No such person should appear but under the guardianship of a committee, a prochein ami, or a trustee, that the court may see that its process is employed by some intelligent and responsible party.

I shall decree that the libel be dismissed, and with costs, as a necessary consequence, although the latter part of the order must, of course, be inefficacious and nugatory.